# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CARLYLE INVESTMENT MANAGEMENT L.L.C., TC GROUP, L.L.C., TCG HOLDINGS, L.L.C., DAVID M. RUBENSTEIN, DANIEL A. D'ANIELLO, WILLIAM E. CONWAY, JR., JAMES H. HANCE, JOHN C. STOMBER, and MICHAEL J. ZUPON, | ) ) ) ) ) ) ) ) | |
| | ) | C.A. No. 7841-VCP |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| MOONMOUTH COMPANY S.A., PLAZA MANAGEMENT OVERSEAS S.A., PARBOLD OVERSEAS LTD., LOUIS J.K.J. REIJTENBAGH, and STICHTING RECOVERY CCC, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 1, 2015
Date Decided: September 10, 2015

R. Judson Scaggs, Jr., Esq., Shannon E. German, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Robert A. Van Kirk, Esq., R. Hackney Wiegmann, Esq., Nicholas J. Boyle, Esq., Sarah F. Teich, Esq., Brian C. Rabbitt, Esq., WILLIAMS & CONNOLLY LLP, Washington, D.C.; *Attorneys for Plaintiffs.*

Michael F. Bonkowski, Esq., COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A., Wilmington, Delaware; Alan Kolod, Esq., Mark N. Parry, Esq., Nicholas Brannick, Esq., Gregory J. Fleesler, Esq., Zaid Shukri, Esq., MOSES & SINGER LLP, New York, New York; *Attorneys for Plaza Management Overseas S.A. and Louis J.K.J. Reijtenbagh.*

David L. Finger, Esq., FINGER & SLANINA, LLC, Wilmington, Delaware; *Attorneys for Liquidators of Carlyle Capital Corporation Limited (in Liquidation).*

**PARSONS, Vice Chancellor.**

A group of plaintiffs, comprised of various individuals and entities related to a private equity fund, filed suit against the defendant and several of his entities seeking money damages and an injunction due to alleged breaches of various contracts containing releases and forum selection clauses. The defendants moved to dismiss the complaint in its entirety on the grounds of lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim. In the alternative, the defendants moved to strike several paragraphs of the complaint as scandalous and impertinent.

After briefing on the motion, I stayed this case pending resolution of the defendants' efforts to remove to federal court. The Third Circuit Court of Appeals later issued a decision confirming that the removal was improper and that the case properly had been remanded to this court. That decision bears on the resolution of the defendants' motion. For the reasons that follow, the motion to dismiss is granted in part and denied in part. Additionally, I deny the motion to strike, except for ordering a single footnote stricken.

## I.     BACKGROUND[1]

### A.     Parties

Non-party Carlyle Capital Corporation, Ltd. ("CCC") was a limited company organized under the laws of the Island of Guernsey, Channel Islands in August 2006.

---

[1]     The facts are drawn from the allegations in the plaintiffs' First Amended Verified Complaint (the "Complaint"), which are assumed true for purposes of the defendants' motion to dismiss, as well as documents integral to the Complaint.

1

CCC invested primarily in residential mortgage backed securities tied to home mortgages in the United States. As a result of the 2008 financial crisis, CCC's cash reserves were depleted, and it was in default on various financing agreements as of early March 2008. Later that month, CCC was placed into liquidation by the Royal Court of Guernsey, and several liquidators (the "Liquidators") were appointed to oversee the winding up of CCC.

Plaintiff Carlyle Investment Management, L.L.C. ("CIM") is a Delaware limited liability company ("LLC") with its principal places of business in the District of Columbia and New York. CIM served as the investment manager of CCC from CCC's inception until it was placed into liquidation. Plaintiff TC Group, L.L.C. ("The Carlyle Group") is an affiliate of both CIM and Plaintiff TCG Holdings, L.L.C. ("TCGH"), a Delaware LLC that functions as a holding company.

Plaintiffs David M. Rubenstein, Daniel A. D'Aniello, and William E. Conway, Jr. are co-founders and managing directors of The Carlyle Group. Plaintiffs James H. Hance, John C. Stomber, and Michael J. Zupon held officer or director positions at CCC. I refer to CIM, The Carlyle Group, TCGH, Rubenstein, D'Aniello, Conway, Hance, Stomber, and Zupon collectively as "Plaintiffs" or simply "Carlyle."

Defendant Louis J.K.J. Reijtenbagh is a Dutch citizen allegedly residing in Monte Carlo, Monaco or Hong Kong. Defendants Moonmouth Company S.A. ("Moonmouth"), Plaza Management Overseas, S.A. ("Plaza"), and Parbold Overseas, Ltd. ("Parbold") are companies affiliated with Reijtenbagh. Each is organized under the laws of the British Virgin Islands. Reijtenbagh owns Plaza and serves as its President and CEO; he is also the beneficial owner of Moonmouth and Parbold.

2

Defendant Stiching Recovery CCC ("SRCCC") is an entity incorporated under Dutch law, with its registered office in The Netherlands.[2] SRCCC allegedly was created, directly or indirectly, by or at the insistence of Reijtenbagh or his affiliates. SRCCC's sole purpose is to represent the interests of CCC's stockholders. Together, Reijtenbagh, Plaza, Parbold, Moonmouth, and SRCCC are referred to as "Defendants."[3]

## B. Facts

### 1. Reijtenbagh's investment in CCC

Shortly after its formation, CCC began raising capital. On or about December 20, 2006, Reijtenbagh caused Plaza to cause Moonmouth to purchase three million Class B shares of CCC for $60 million (the "Subscription Agreement").[4] In 2007, Reijtenbagh

---

[2] A "stiching" apparently is a special-purpose corporate form used to pursue what in the U.S. would be a class action. No comparable procedural device seems to exist under Dutch law, thus necessitating the use of the stiching.

[3] SRCCC, Moonmouth, and Parbold are essentially nominal defendants. Each entity has been dissolved. Moonmouth and Parbold were dissolved in November 2012. Under the laws of the British Virgin Islands, "a dissolved company [cannot] be sued, and the company can take no legal action whatsoever. . . . Since both Moonmouth and Parbold ceased to exist under the law of the [British Virgin Islands] at the time of their dissolution, there is no legal possibility of their legal liability." *Carlyle Inv. Mgmt., LLC v. Plaza Mgmt. Overseas S.A.*, 2013 WL 4407685, at *2 (D. Del. Aug. 14, 2013) (remanding this action to this Court). SRCCC also was dissolved, but the date of that dissolution and the mechanics of Dutch corporate dissolution are not apparent in the record. Additionally, it does not seem that SRCCC ever was served. Accordingly, the only remaining actual defendants are Reijtenbagh and Plaza. The "Defendants" shorthand should be understood to incorporate this history.

[4] Aff. of Michael F. Bonkowski [hereinafter "Bonkowski Aff."] Ex. 3 [hereinafter "SA"]. The SA is integral to the Complaint. Compl. ¶ 27. Plaza appears to have been the sole director of Moonmouth.

3

caused Moonmouth to transfer one million of those shares to Parbold. Only Moonmouth was a party to the Subscription Agreement. The Subscription Agreement provides that it is to be "governed, construed and enforced solely under the laws of the State of Delaware,"[5] and it contains the following Delaware forum selection clause (the "Subscription Agreement FSC"):

> The courts of the State of Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Subscription Agreement and the Investor hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding, or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and the Investor hereby submits to such jurisdiction.[6]

About a year and a half after CCC was incorporated, the recent financial crisis struck, and "the U.S. financial markets experienced a sudden and extreme liquidity crisis, resulting in unprecedented instability in both the valuation of CCC's assets and its financing for those assets."[7] Soon thereafter, CCC was placed into liquidation. In July 2010, the Liquidators filed several actions, in various venues, against CCC's former managers, including some or all of Plaintiffs. At least one such action, in Guernsey, remains ongoing (the "Guernsey Litigation"). In the Guernsey Litigation, the Liquidators

---

[5]    SA, *supra* note 4, § 7.

[6]    SA, *supra* note 4, § 8.

[7]    Compl. ¶ 31.

4

have asserted, among other things, various breach of fiduciary duty claims and are seeking more than $1 billion in damages.

## 2.    The Bundora Transfer Agreements

The Complaint alleges that Reijtenbagh encountered a string of setbacks beginning in early 2009 that caused him serious legal and financial difficulty.  According to the Complaint, Reijtenbagh sought to alleviate his financial situation by liquidating some of his investments.  CCC was not Reijtenbagh's only Carlyle investment.  Through other affiliated entities, including Bundora Associates, Inc. ("Bundora"), Reijtenbagh owned interests in Carlyle Partners V, L.P. ("CPV") and Carlyle Europe Partners III, L.P. ("CEP III").  Those interests allegedly could not be transferred without Carlyle's consent and assistance.

In or around August and September 2009, a series of seven transfer agreements (the "Transfer Agreements")[8] were executed by Bundora, the third-party purchasers, and various Carlyle affiliates, including CPV and CEP III.  Plaza, as Bundora's sole director, signed the Transfer Agreements via Reijtenbagh as its director.  Although Plaintiffs have treated the Transfer Agreements as a unit, the five that transferred Bundora's interests in CPV (the "CPV Transfer Agreements") are governed by New York law (the "CPV Transfer Agreements Choice of Law Provisions"),[9] and the two that transferred

---

[8]    Bonkowski Aff., *supra* note 4, Exs. 4-10.

[9]    Bonkowski Aff., *supra* note 4, Exs. 5 § 14, 6 § 14, 7 § 14, 8 § 14, 10 § 14 [hereinafter, together, the "CPV TA COLPs"].

Bundora's interests in CEP III (the "CEP III Transfer Agreements") are governed largely by English law (the "CEP III Transfer Agreements Choice of Law Provisions").[10] The CPV Transfer Agreements have forum selection clauses requiring the parties to "submit to the *non-exclusive* jurisdiction of the State of New York" (the "CPV FSCs");[11] the CEP III Transfer Agreements include forum selection clauses requiring lawsuits to be brought only in England, Delaware state court, New York state court, or federal district court in the Southern District of New York (the "CEP III FSCs" and, together with the CPV FSCs, the "Transfer Agreements FSCs").[12]

More pertinent for present purposes, however, are the releases found in the Transfer Agreements (the "Releases"). The Complaint, at least, suggests that the Releases are substantively identical case studies in garbled drafting. The Releases state:

> In consideration of the promises and other consideration set out herein: (*a*) Assignor [Bundora] and Assignee [third-party purchaser] on the one hand; and (*b*) the General Partners and the Partnership [Carlyle's Affiliates] on the other hand (including in each case, each of their respective predecessors in interest, successors in interest, present and former Affiliates and any agents, representatives, officers, directors, employees, executives, parents, shareholders, partners, members, principals, subsidiaries and controlled companies, heirs, executors, administrators, successors, assigns, sister or

---

[10]     Bonkowski Aff., *supra* note 4, Exs. 4 § 16, 9 § 16 [hereinafter, together, the "CEP III TA COLPs"]. See *infra* Section II.A.3.a for a more in-depth discussion of the choice of law provisions in the Transfer Agreements.

[11]     Bonkowski Aff., *supra* note 4, Exs. 5 § 14, 6 § 14, 7 § 14, 8 § 14, 10 § 14 (emphasis added).

[12]     Bonkowski Aff., *supra* note 4, Exs. 4 § 16, 9 § 16.

related companies and partnerships of the foregoing (collectively, the "Related Parties")) hereby fully release and discharge the other and, in each case, the other's Related Parties, from any and all obligations, claims, demands, damages, liabilities, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents and executions whatsoever, of whatever kind or nature, actions, causes of action or suits at law or in equity of whatever kind, state or federal, known or unknown, suspected or unsuspected, whether brought in any federal or state court, or in any court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, which any of the releasing parties ever had or now has, or may have in the future, upon or by reason of any matter, cause or thing occurring on or prior to the Effective Date, except as otherwise explicitly provided in this Agreement.[13]

Plaintiffs contend that the Releases mean that Defendants, including Reijtenbagh and Plaza, released all claims against Carlyle, even though only Bundora was a party to the Transfer Agreements and even though the Releases were executed in connection with a transfer of investments in CEP III and CPV, rather than in CCC. Defendants deny that contention and argue that, among the persons and entities affiliated with Reijtenbagh, only Bundora was bound by the Releases.

### 3. The Dutch Tolling Letters and SRCCC

Sometime after CCC was placed into liquidation in 2008, Reijtenbagh allegedly engaged Lipman Karas, an Australian law firm with which he worked previously and to which he allegedly had provided funding for prior litigation, to analyze potential claims

---

[13] Bonkowski Aff., *supra* note 4, Exs. 4 § 9, 5 § 10, 6 § 10, 7 § 10, 8 § 10, 9 § 9, 10 § 10.

against Carlyle. The result of that retention was the "Lipman Karas Memo," a copy of which was provided to representatives of Carlyle. It is unclear whether the Lipman Karas Memo was prepared before or after the Releases were signed.

The Complaint is silent as to the years 2010 and 2011, though it is possible SRCCC was formed in one of those years. The next substantive activity occurred in the summer of 2012. Reijtenbagh or his affiliates retained Lemstra van der Korst, a Dutch law firm, to prepare letters of some import under Dutch law. The Complaint alleges that the Dutch statute of limitations (here, Article 3:317 of the Dutch Civil Code) can be interrupted in certain ways, such as by sending a special letter to such effect.[14] In June or July 2012, the former independent directors of CCC received two such letters: the Moonmouth Letter and the SRCCC Letter (together, the "Dutch Tolling Letters").

The Moonmouth Letter[15] "recounted the circumstances of Moonmouth's $60 million investment in CCC and alleged that Plaintiffs are responsible for CCC's failure in spring 2008."[16] Specifically, the Moonmouth Letter stated: "Moonmouth holds the Carlyle Entities and the Policymakers liable, each individually as well as jointly, for all the damage that it has sustained and any and all damage that it sustains in the future in

---

[14] The Complaint and the limited record available on Defendants' motion to dismiss provide little insight on the relevant details of Dutch law. Accordingly, this description likely is a significant oversimplification.

[15] Trans. Aff. of Shannon E. German [hereinafter "German Aff."] Ex. 18 [hereinafter "Moonmouth Letter"]. The Moonmouth Letter was sent in Dutch and English. All citations are to the English version.

[16] Compl. ¶ 55.

connection with the CCC Shares."[17] The Moonmouth Letter purported to interrupt the statute of limitations on behalf of "Moonmouth, Plaza Management, Parbold, Mr Reijtenbagh and any and all persons and/or legal entities affiliated with Mr Reijtenbagh, in connection with the compensation of damage sustained in connection with the investment in CCC . . . ."[18] Plaintiffs allege that, but for the Moonmouth Letter, the relevant statute of limitations would have expired on or before July 11, 2012.

The SRCCC Letter[19] stated that "SRCCC's purpose—in accordance with its Articles of Association—is representing the interests of all parties (both natural persons and legal entities) that hold and/or held shares in" CCC.[20] That group included Parbold and Moonmouth. The SRCCC Letter, like the Moonmouth Letter, purported to toll the statute of limitations on various claims and to hold Plaintiffs responsible for CCC's failure and "for all the damages that the investors sustained and any and all damage that they will sustain in the future in connection with the CCC Shares."[21]

On September 6, 2012, Plaintiffs filed their initial Verified Complaint and provided a copy to Lemstra van der Korst the next day. Within a week, Defendants' Dutch counsel responded by "disclaiming any intent . . . to pursue proceedings against

---

[17]     Moonmouth Letter, *supra* note 15, at 7.

[18]     Moonmouth Letter, *supra* note 15, at 8.

[19]     German Aff., *supra* note 15, Ex. 19. All citations are to the English version of the SRCCC Letter.

[20]     German Aff., *supra* note 15, at 4.

[21]     German Aff., *supra* note 15, at 7.

Plaintiffs" and withdrawing the Dutch Tolling Letters.[22]  Thereafter, Plaintiffs apparently provided a proposed stipulation to Defendants, which Defendants refused to sign and which was not quoted in the Complaint.  The stipulation allegedly would have confirmed that: (a) the Dutch Tolling Letters no longer had any effect; (b) the statute of limitations had run on Defendants' claims; and (c) Defendants would take no action in pursuit of their claims outside of Delaware.  Defendants characterize the proposed stipulation as essentially a trap and contend that it greatly exceeded the scope of the forum selection clauses at issue in this action.

### 4.  The Guernsey Litigation

As of the date of this Memorandum Opinion, the Guernsey Litigation remains pending.  The Liquidators pursuing that action needed litigation funding.  The Complaint alleges that Reijtenbagh has a history of providing litigation funding, that Lipman Karas is counsel to the Liquidators, and that the claims being pursued in the Guernsey Litigation are substantially similar to the claims outlined in the Lipman Karas Memo. Based on these facts, Plaintiffs allege that Reijtenbagh, directly or indirectly, is financing the Guernsey Litigation and, as a result, is violating the Releases.

### C.  The Federal Removal Proceedings

Plaintiffs amended and filed the Complaint on October 23, 2012.  Plaza removed the case to federal court on December 18, 2012.  Plaintiffs moved to remand on January 17, 2013.  On August 14, 2013, the U.S. District Court for the District of Delaware

---

[22]  Compl. ¶ 67.

remanded the case back to this Court on the grounds that: (1) the Subscription Agreement FSC required all claims to be brought in the Delaware courts; and (2) Reijtenbagh, Parbold, and Plaza, although not parties to the agreement, were bound by that clause by virtue of being closely related to the Subscription Agreement.[23] Plaza appealed.

On February 25, 2015, the U.S. Court of Appeals for the Third Circuit affirmed the District Court's ruling (the "Third Circuit Decision").[24] The Third Circuit analyzed the Subscription Agreement FSC and concluded that it was valid and that Plaza, Parbold, and Reijtenbagh were closely related to the agreement and therefore bound by the forum selection clause. The Court also rejected Defendants' argument that Plaintiffs lacked standing to enforce the Subscription Agreement FSC.

As an independent alternative holding, the Third Circuit determined that the Transfer Agreements FSCs also required this litigation to proceed in Delaware state court. According to the Third Circuit, all Defendants are bound by that clause because they are affiliates of signatory Bundora. Implicit in that holding as to the Transfer Agreements is a finding that Plaintiffs also have standing to enforce the Transfer Agreement. Finally, the Court of Appeals rejected Defendants' argument that Plaintiffs were estopped from enforcing the forum selection clause in the Subscription Agreement

---

[23]    *Carlyle Inv. Mgmt., LLC v. Plaza Mgmt. Overseas S.A.*, 2013 WL 4407685, at *2 (D. Del. Aug. 14, 2013).

[24]    *Carlyle Inv. Mgmt., LLC v. Plaza Mgmt. Overseas S.A.*, 779 F.3d 214 (3d Cir. 2015).

because, according to Defendants, they had pled that the Releases negated the Subscription Agreement and, hence, its forum selection clause.

## D. Procedural History

Although this case remains at the pleadings stage, it has a long and tortured history, as exemplified by the fact that this Court alone now has issued three written opinions in it. After Plaza attempted unsuccessfully to remove the case and during the pendency of its appeal of the remand, Defendants argued simultaneously for a stay of this action and moved to dismiss or, in the alternative, to strike portions of the Complaint in this Court. After the parties briefed the motions to stay, dismiss, and strike, Defendants submitted a letter identifying additional cases supporting their position that were not mentioned during their initial briefing.[25] Predictably, this triggered a new round of submissions.

I heard argument on the motions on May 6, 2014 (the "Argument"), at which time I stayed this action pending resolution of the appeal to the Third Circuit. I allowed discovery to proceed, however, solely on the issue of personal jurisdiction. Defendants then moved for a protective order and for reconsideration. On August 21, 2014, I issued a letter opinion denying those motions.[26]

---

[25]  In their Opening Brief, Defendants already had cited sixty-five cases.

[26]  *Carlyle Inv. Mgmt., LLC v. Moonmouth Co., S.A.*, 2014 WL 4104702 (Del. Ch. Aug. 21, 2014).

12

Although the lion's share of this case was stayed at the time, the Guernsey Liquidators almost immediately moved to intervene and filed yet another motion for a protective order. After lengthy briefing on that motion, I heard argument on it and rendered partial rulings, which were followed by still further briefing. On February 24, 2015, I issued a Memorandum Opinion resolving most of the remaining issues raised by the Guernsey Liquidators' motions.[27]

The next day, the Third Circuit issued its decision affirming the District Court's remand order. As a consequence, Defendants' pending, fully briefed and argued motion to dismiss reappeared on this Court's radar. The parties filed supplemental briefs as to the effects of the Third Circuit Decision on the motion to dismiss, which arguably were significant. I then took the matter under advisement and determined to proceed without further argument.

## II.    ANALYSIS

### A.    Motion to Dismiss

#### 1.    Standard of review

Pursuant to Court of Chancery Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. "[T]he governing pleading standard in

---

[27]    *Carlyle Inv. Mgmt., LLC v. Moonmouth Co., S.A.*, 2015 WL 778846 (Del. Ch. Feb. 24, 2015).

13

Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[28] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[29] This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[30] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[31] Moreover, failure to plead an element of a claim precludes entitlement to relief, and, therefore, is grounds to dismiss that claim.[32]

Generally, the court will consider only the pleadings on a motion to dismiss under Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[33]

---

[28] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[29] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[30] *Id.* at 537 & n.13.

[31] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[32] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[33] *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

14

### 2.      Law of the case versus collateral estoppel

#### a.      Distinction between the doctrines

Defendants' efforts to remove this case to federal court resulted in the Third Circuit Decision. Defendants argue that the law of the case doctrine should guide this Court's treatment of the effect of that decision; Plaintiffs assert that collateral estoppel governs. Although similarities exist between the law of the case doctrine and collateral estoppel, there are some important distinctions. I conclude that the Third Circuit Decision is entitled to collateral estoppel effect in this action.

"The law of the case doctrine, like the *stare decisis* doctrine, is founded on the principle of stability and respect for court processes and precedent."[34] "The law of the case is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout litigation."[35] In practical terms, the doctrine appears most often when a trial court is required to give effect to law established in a case after it has been appealed and the appellate court has ruled on the relevant issues.[36] The doctrine also applies to decisions rendered by a court that arise again later in the same court, in the same proceedings—*i.e.*, a ruling at the summary judgment stage that also applies at the post-trial stage.[37] In more simplified terms, the law of the case doctrine operates as a

---

[34]      *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000).

[35]      *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014) (quoting *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990)) (internal quotations omitted).

[36]      *See Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 860-61 (Del. 2008).

[37]      *Taylor v. Jones*, 2006 WL 1510437, at *5-6 (Del. Ch. May 26, 2006).

15

form of intra-litigation *stare decisis*. But, like *stare decisis*, the "law of the case doctrine is neither inflexible nor an absolute bar to reconsideration of a prior decision that is 'clearly wrong, produces an injustice, or should be revisited because of changed circumstances.'"[38]

Collateral estoppel, on the other hand, which is "also known as issue preclusion, prevents a party who litigated an issue in one forum from later relitigating that issue in another forum."[39] Under Delaware law, "the 'preclusive effect of a foreign judgment is measured by [the] standards of the rendering forum.'"[40] Accordingly, in this instance, the law of the Third Circuit controls. In the Third Circuit, "[i]ssue preclusion applies when '(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.'"[41] While there are exceptions to the law of the case doctrine, "collateral estoppel is considered an absolute bar to relitigation of an issue."[42] Another distinction is that the law of the case doctrine

---

[38]    *Advanced Litig., LLC v. Herzka*, 2006 WL 2338044, at *5 (Del. Ch. Aug. 10, 2006) (quoting *Hamilton v. State*, 831 A.2d 881, 887 (Del. 2003)).

[39]    *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *11 (Del. Ch. Oct. 31, 2014).

[40]    *Acierno v. New Castle Cty.*, 679 A.2d 455, 459 (Del. 1996) (quoting *Columbia Cas. Co. v. Playtex F.P., Inc.*, 584 A.2d 1214, 1217 (Del. 1991)).

[41]    *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (quoting *In re Braen*, 900 F.2d 621, 628-29 n.5 (3d Cir. 1990)). *See also Leyse v. Bank of Am., Nat'l Ass'n*, 538 Fed. App'x 156, 158-59 (3d Cir. 2013) (identical statement of the standard).

[42]    *Izquierdo v. Sills*, 2004 WL 2290811, at *4 n.28 (Del. Ch. June 29, 2004).

16

applies only to questions of law.[43] Collateral estoppel generally is thought of as applying to questions of fact,[44] but under federal law, at least, collateral estoppel also bars relitigation of legal issues.[45]

In most cases, distinctions between collateral estoppel and the law of the case doctrine are immaterial. Indeed, in the one instance, of which I am aware, that this Court addressed which doctrine applies to a federal remand order, the Court did not need to dilate upon those distinctions. Instead, the Court considered "the determinations of the federal court, as to those issues also before this Court, binding as a general matter of estoppel."[46] Here, as discussed in Section II.A.3.b *infra*, Defendants have contended that at least one of the Third Circuit's determinations was clearly erroneous in an attempt to satisfy an exception to the law of the case doctrine. Defendants have not argued that there is such an exception to collateral estoppel.

Based on the circumstances of this case, I conclude that the doctrine of collateral estoppel should guide my analysis of the effect of the Third Circuit Decision. The law of

---

[43]   *Id.*

[44]   *See Betts v. Townsends, Inc.*, 765 A.2d 531, 534 (Del. 2000) ("Essentially, *res judicata* bars a court or administrative agency from reconsidering conclusions of law previously adjudicated while collateral estoppel bars relitigation of issues of fact previously adjudicated.").

[45]   *See United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984) ("As commonly explained, the doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action.").

[46]   *Izquierdo*, 2004 WL 2290811, at *4 n.28.

the case doctrine, by its terms, contemplates one continuous action within the same court system. Both the rulings I issue and the rulings issued on appeal by the Delaware Supreme Court would be binding as law of the case. Analogizing the law of the case doctrine to *stare decisis* makes sense within this setting: the rulings of the Supreme Court are controlling precedent in Delaware, but, in the course of the same case, the Supreme Court later could modify or clarify its previous ruling. In theory, a litigant could appeal, lose, appeal again, and the Supreme Court could change course. That possibility simply does not exist with respect to the Third Circuit Decision. Defendants could have appealed to the U.S. Supreme Court, but they cannot now appeal back to the District of Delaware or the Third Circuit.

These facts point to a related issue: the federal proceedings, although part of this case, were essentially a completely separate action. Those proceedings concerned the same parties litigating whether Defendants could remove this case to federal court, an issue governed by federal law. In the course of the proceedings, the Third Circuit made final and binding rulings of law and fact, some of which are relevant to this litigation. This scenario readily falls within the contours of collateral estoppel: the parties litigated a different question in another set of courts, but now seek to litigate some of the same underlying issues in this Court. Therefore, I view the federal court proceedings as a separate action and analyze the Third Circuit Decision in terms of collateral estoppel.

### b. Collaterally estopped arguments

As to several issues in dispute in relation to Defendants' motion to dismiss, the Third Circuit Decision readily satisfies all of the conditions for collateral estoppel.[47] That is, as to the issues discussed below, I find that they: (1) are the same in both cases; (2) were actually litigated; (3) were determined by a final and valid judgment; and (4) were essential to that judgment.

First, the Third Circuit held that Plaintiffs could enforce the Subscription Agreement. Second, the Third Circuit held that Plaintiffs were not judicially estopped from enforcing the Subscription Agreement. Third, the Third Circuit concluded that: (i) Defendants were closely related to the Subscription Agreement FSC, which the court otherwise found valid; and (ii) therefore, that clause could be enforced against them. As such, because the Subscription Agreement FSC states that the "courts of the State of Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Subscription Agreement,"[48] the Third Circuit concluded that jurisdiction in this Court is proper.

The Subscription Agreement FSC further provides, among other things, that "the Investor hereby submits to such jurisdiction [*i.e.*, in the state courts of Delaware]."[49] Accordingly, because Defendants are collaterally estopped from arguing that the

---

[47] One issue relating to the Transfer Agreements is less clear; I address that question in Section II.A.3.b *infra*.

[48] SA, *supra* note 4, § 8.

[49] SA, *supra* note 4, § 8.

19

Subscription Agreement FSC does not apply to them, Defendants' motion to dismiss for lack of personal jurisdiction is denied.

### 3. Count I: Breach of the Releases

Defendants move to dismiss Count I of the Complaint on the grounds that it fails to state a claim for which relief can be granted. The interpretation of a contract is a question of law.[50] "[D]efendants are not entitled to dismissal under Rule 12(b)(6) unless the interpretation of the contract on which their theory of the case rests is the 'only reasonable construction as a matter of law.'"[51] If there is more than one reasonable construction of contractual language, then the contract is ambiguous.[52] Contractual language, however, "is not ambiguous simply because the parties disagree on its meaning."[53] Instead, the court will apply standard principles and canons of construction in construing the contract.

---

[50]  *See, e.g.*, *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at \*2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at \*9 (Del. Ch. May 2, 2007)); *see also AHS N.M. Hldgs., Inc. v. Healthsource, Inc.*, 2007 WL 431051, at \*3 (Del. Ch. Feb. 2, 2007) ("Under general principles of contract law, interpretation of contractual language is purely a question of law.").

[51]  *Kahn v. Portnoy*, 2008 WL 5197164, at \*3 (Del. Ch. Dec. 11, 2008) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

[52]  *VLIW Tech.*, 840 A.2d at 615 ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

[53]  *E.I. du Pont de Nemours & Co., Inc. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

20

Plaintiffs contend that the Third Circuit Decision undercuts several of Defendants' arguments. For their part, Defendants deny that they are bound by the Releases and contend that even if they were, no breach of the Releases has been pled. I address these issues in turn after first exploring a choice of law question.

### a. Choice of law

As an initial matter, I note that the parties appear to have sidestepped a lurking choice of law question in arguing the motion to dismiss. The CPV Transfer Agreements are governed entirely by New York law.[54] The CEP III Transfer Agreements, on the other hand, are governed by split choice of law clauses that read as follows:

> This Agreement and the rights of the parties under this Agreement and the Partnership Agreement are governed by, and shall be construed in accordance with, English law, except that the term "gross negligence" as referred to in the Partnership Agreement shall have the meaning given to it under, and be governed and construed and interpreted in accordance with, the laws of the State of New York in the United States.[55]

The Releases in the CEP III Transfer Agreements do not contain, among their many words, the term "gross negligence." That term also does not appear in the briefing on the motion to dismiss. For purposes of Defendants' motion, therefore, I assume those Releases are governed by English law.

---

[54]  CPV TA COLPs, *supra* note 9.

[55]  CEP III TA COLPs, *supra* note 10.

This Court is not expert in English law, and the parties failed to make any effort to explain English law on this subject or to cite any English cases.[56] Instead, they assumed New York law, which governs the CPV Transfer Agreements, applies. In these circumstances, I assume for purposes of Defendants' motion to dismiss that there are no material differences between New York and English law regarding the issues presented by that motion,[57] and I interpret the Releases under New York law.

**b.**      **Is the Third Circuit Decision determinative on whether the Releases were breached?**

The Third Circuit held, in the alternative, that Defendants are bound by the CEP III FSCs (the "Alternative Ruling"). This implies that Plaintiffs have standing to enforce

---

[56]     Defendants did cite one New York Supreme Court decision as supporting their position under English law: *MBIA Ins. Corp. v. Royal Bank of Can.*, 2010 WL 3294302 (N.Y. Sup. Ct. Aug. 19, 2010). That court relied on expert affidavits on English law. *Id.* at \*24 ("Accordingly, for purposes of this decision, the Court must accept that, under English law, there are no circumstances under which a non-party to a contract may be held liable for its breach and, therefore, if English law applies, there is no basis to hold RBCCMC and RBC Europe liable on the relevant contracts."). Ultimately, however, it does not appear that the New York Supreme Court addressed the substance of English law because it found that the allegations in the complaint "are simply insufficient to plead a breach of contract claim as against these non-parties." *Id.* (citing a New York case).

[57]     *See Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1245-46 (Del. Ch. 2010) ("Here, the agreements clearly chose English law to govern the parties' relationship . . . . It is telling, however, that neither party has cited to English law—the law for which they bargained—in its briefing on this motion to any material degree. That illustrates the basic problem with adjudicating this dispute in Delaware: this court does not have—and cannot pretend to have—the same knowledge of English law or even access to English sources as the courts of England. In deference to the English courts, for which this court has great respect, and because the parties have not cited to English law to an appreciable extent, the analysis will proceed under Delaware law.") (footnotes omitted).

22

the Transfer Agreements. I conclude that this holding is entitled to collateral estoppel effect here. Defendants contend that the Alternative Ruling was merely dicta and, in any event, was clearly erroneous under Delaware law.

The Alternative Ruling was not dicta. The Third Circuit Decision indicates that it is an independent alternative holding.[58] Coincidentally, I recently addressed the issue of the collateral estoppel effect of alternative holdings under Third Circuit law and determined that they are entitled to preclusive effect.[59]

In addition, I conclude for two independent reasons that I need not address Defendants' further argument that the Alternative Ruling was clearly erroneous. First, I have determined that collateral estoppel, not the law of the case doctrine, governs this question. Thus, even if the Alternative Ruling was clearly erroneous under Delaware law, it still would be entitled to preclusive effect on the issue decided.

Second, I disagree with Plaintiffs' assertion that the Alternative Ruling necessitates a finding that the Releases bind Defendants. According to Plaintiffs, the Third Circuit Decision held that the plain language of the CEP III FSCs binds Bundora's affiliates, including Plaza and Reijtenbagh. Plaintiffs ask me to extrapolate from that

---

[58] *Carlyle Inv. Mgmt.*, 779 F.3d at 220-21 ("Carlyle argues that we could also affirm the District Court's remand on the alternative ground that one of the agreements containing a release that Carlyle seeks to enforce also contains an enforceable forum selection clause. We agree.").

[59] *Yucaipa Am. Alliance Fund I, LP*, 2014 WL 5509787, at *12 n.52 ("[T]he Third Circuit recently took a side in the circuit split over the preclusive effect of alternative judgments . . . [and] came down firmly on the side of giving preclusive effect to . . . [alternative] holdings.").

23

holding and conclude that because the Third Circuit held that the CEP III Transfer Agreements could bind Bundora's affiliates via the CEP III FSCs, the Transfer Agreements also could bind Plaza and Reijtenbagh via the Releases. The elements of collateral estoppel, however, are not satisfied with respect to the latter proposition.

Collateral estoppel requires that an issue be "actually litigated." While I have no doubt that Defendants actually litigated whether the Transfer Agreements allowed removal to federal court, the issue of the Releases was not litigated. As noted, the Releases are governed by New York and English law. The alternative holding section of the Third Circuit's opinion cited only two Third Circuit cases relevant to whether the removal standard was satisfied. No cases were cited from New York, England, or even Delaware. While I consider the personal jurisdiction issue here to have been resolved by the Third Circuit Decision, the elements of collateral estoppel do not go so far as to allow me to conclude that, because the Third Circuit held that the CEP III FSCs precluded removal under 28 U.S.C. § 1441(a)—the federal removal statute—the Releases also bind Plaza and Reijtenbagh. That issue was not actually litigated.

### c. Are Defendants bound by the Releases?

For Defendants to succeed on their Rule 12(b)(6) motion, they must show that their interpretation of the Releases is the only reasonable interpretation. Defendants argue that the Releases—which their counsel described at the Argument as "extremely poorly worded releases, poorly constructed releases"[60]—are unambiguous and do not

---

[60]    Arg. Tr. 66.

bind nonsignatories Plaza and Reijtenbagh. Plaintiffs contend that the Releases unambiguously do bind Defendants or, at a minimum, that the Releases are ambiguous. For the reasons that follow, I conclude that Defendants' construction is not the only reasonable one and therefore the Releases are ambiguous.

At the outset, I reject Defendants' argument that they cannot be bound under any circumstances because they were non-parties to the contract.[61] Plaintiffs are not, as Defendants contend, attempting to hold Reijtenbagh and Plaza liable because they signed the agreement as Bundora's representatives. Plaintiffs' argument, properly understood, is that Defendants are bound because Bundora agreed to release its Related Parties' claims and that Bundora had the actual or apparent authority to do so. I return to this point *infra*. First, however, I address Defendants' textual argument.

The relevant portion of the Releases states:

> In consideration of the promises and other consideration set out herein: (*a*) Assignor [Bundora] and Assignee [third-party purchaser] on the one hand; and (*b*) the General Partners and the Partnership [Carlyle] on the other hand (including in each case, [a long list of related individuals or entities] (collectively, the "Related Parties")) hereby fully release and discharge the other and, in each case, the other's Related Parties . . . .

---

[61] With respect to this broad assertion, I do consider the Third Circuit Decision to be entitled to collateral estoppel effect. Specifically, the Third Circuit's holding that Reijtenbagh and Plaza were bound by the CEP III FSCs even though they were not signatories is binding in this action. *Carlyle Inv. Mgmt.*, 779 F.3d at 220-21. The Third Circuit Decision in this regard, however, dealt only with forum selection clauses.

25

Defendants argue that reading this language so as to release Bundora's affiliates' claims against Carlyle would violate three separate canons of contract interpretation: (1) the "last antecedent rule"; (2) a heretofore unnamed doctrine about semicolons; and (3) the rule against surplusage. I address these contentions in turn.

The crux of the disagreement concerns who is bound by the phrase "hereby fully release and discharge the other and, in each case, the other's Related Parties." Defendants argue that the Releases state that Bundora and its purchaser [A] "on the one hand" and Carlyle's Affiliates [B] "on the other hand," including Related Parties [C],[62] release each other [A and B release each other; A and B's C release each other] and, "in each case, the other's Related Parties" [B and B's C release A's C]. Under this view, Bundora released its claims against Carlyle's Affiliates and their Related Parties and received releases from Carlyle's Affiliates and their Related Parties *and* Bundora's Related Parties received—but did not give—releases from Carlyle's Affiliates and their Related Parties. This interpretation holds that Bundora and its Related Parties, including Plaza and Reijtenbagh, received releases of greater scope than they granted. Plaintiffs instead argue that the Releases were mutual in nature and work like this: Bundora and its Related Parties release Carlyle's Affiliates and their Related Parties [A and A's C release

---

62    Because of the parties' fairly complicated arguments, I use this [A], [B], and [C] construction in an attempt to explain those arguments more easily. [A] means "(*a*) Assignor [Bundora] and Assignee [third-party purchaser]." [B] means "(*b*) the General Partners and the Partnership [collectively, Carlyle's Affiliates]." [C] means the entire parenthetical "(including in each case, [a long list of related individuals or entities] (collectively, the "Related Parties"))."

B and B's C] and Carlyle's Affiliates and their Related Parties release Bundora and its Related Parties [B and B's C release A and A's C].

Defendants support their interpretation first by invoking the "last antecedent rule" to argue that the "Related Parties" parenthetical applies only to [B], Carlyle's Affiliates, and not to [A], Bundora. According to Defendants, "[u]nder the 'rule of the last antecedent, . . . a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"[63] Thus, under this rule of construction, "the series 'A or B with respect to C' contains two items: (1) 'A' and (2) 'B with respect to C.'"[64] Although, for the reasons stated *supra*, New York law guides this inquiry, Defendants have not identified any clear New York precedent on the applicability of the last antecedent rule. Instead, Defendants cited a Second Circuit decision, *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, which interprets the federal bankruptcy statute, and a Third Circuit opinion, *Stepnowski v. C.I.R.* *Stepnowski* further identifies a "rule of grammar" under which "the series 'A or B, with respect to C' contains these two items: (1) 'A with respect to C' and (2) 'B with respect to C.'"[65]

---

[63] *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 335 (2d Cir. 2011) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)) (ellipses in original).

[64] *Stepnowski v. C.I.R.*, 456 F.3d 320, 324 n.7 (3d Cir. 2006).

[65] *Id.* The "on the one hand; and . . . on the other hand" structure of the Releases does not fit exactly within either formulation described in *Stepnowski*. In my view, that structure provides more support for Plaintiffs' construction than Defendants'.

27

Defendants argue that the fact that [A] and [B] are separated by a semicolon, not a comma, strengthens their case for applying the last antecedent rule. Digging deep into the well of precedent, but apparently finding no New York law, Defendants rely chiefly on a United States Customs Court case from 1953 in which that court interpreted a clause similar to the one here and held: "[The paragraph] contains two distinct clauses separated by a semicolon. The parenthetical matter is placed at the end of the second clause and is not separated from it by any punctuation other than the parentheses. It is clear, therefore, that the parenthetical matter refers only to the second clause."[66] Again, Defendants rely mainly on several cases outside of New York to support their position.[67] Furthermore, the cited New York cases are not as clearly on point as Defendants' parentheticals would suggest. It is true that, under New York law, "punctuation and grammatical construction are reliable signposts."[68] The language of a contract, however, must be read as a whole and "may disclose an intention which would be thwarted by a strict grammatical construction," in which case courts should "refuse to follow a signpost when it appears

---

[66] *Hirschberg v. United States*, 30 Cust. Ct. 104, 107 (Cust. Ct. Mar. 5, 1953).

[67] *Wilm. Sav. Fund Soc'y, FSB v. Chillibilly's, Inc.*, 2005 WL 1654028, at *1 (Del. Super. June 10) (interpreting the semicolon in Superior Court Rule 6(b)), *aff'd*, 886 A.2d 1279 (Del. 2005) (TABLE); *McLeod v. Nagle*, 48 F.2d 189, 191 (9th Cir. 1931) ("The semicolon effectually isolates the opening clause and its dependent phrase from the other and subsequent clauses.").

[68] *Wirth & Hamid Fair Booking Inc. v. Wirth*, 192 N.E. 297, 299 (N.Y. 1934). *See also Amusement Consultants v. Hartford Life Ins. Co.*, 625 N.Y.S.2d 901, 903, 214 A.D.2d 442, 443 (N.Y. App. Div. 1995) (quoting *Wirth & Hamid*, 192 N.E. at 299).

that it points in the wrong direction."[69]  Indeed, it appears that under New York law, "in a contract containing punctuation marks, the words and not the punctuation guide us in its interpretation," and "[p]unctuation is always subordinate to the text and is never allowed to control its meaning."[70]  As such, there is no hard-and-fast "semicolon doctrine" under New York law.[71]

Finally, Defendants rely on the principle that all terms of a contract are to be given effect whenever possible, and that surplusage is to be avoided.  Defendants argue that, if clause [C] applied to both clauses [A] and [B], then the phrase "and, in each case, the other's Related Parties" would be superfluous because each of the Related Parties already would be included in the portion of the Releases stating "hereby fully release and discharge the other," *i.e.*, [A] and [B] each definitionally would include [C].  Under Defendants' contrary, but rather strained, interpretation, the phrase "and, in each case, the other's Related Parties" purportedly is not superfluous because it means that Bundora's

---

[69]    *Wirth & Hamid*, 192 N.E. at 299.

[70]    *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D. 3d 100, 108, 951 N.Y.S.2d 19, 26 (N.Y. App. Div. 2012).

[71]    Relying on other non-New York cases, Defendants contend that the combination of the last antecedent rule and the semicolon doctrine significantly strengthens their interpretation, and that the drafters of the Releases "unquestionably interpreted" the Releases as Defendants contend.  *Nat'l Sur. Corp. v. Midland Bank*, 551 F.2d 21, 34 (3d Cir. 1977) ("Had the modifying phrase been intended to relate to more than its last antecedent, a comma could have been used to set off the modifier from the entire series."); *Tidal Oil Co. v. Roelfs*, 187 P. 486, 487 (Okla. 1920) ("[I]f the parties intended the restrictive clause to apply to both antecedents, they undoubtedly would have set it off by a comma.").

29

and the purchaser's Related Parties are *receiving* releases that they are not granting reciprocally.

Even assuming Defendants' interpretation is reasonable, I find that it is not the only reasonable interpretation. In fact, Plaintiffs' contrary interpretation is at least as strong because it begins with the actual text of the Releases *and then* moves to canons of construction to confirm that reading. Plaintiffs' interpretation also more closely aligns with the New York cases cited by the parties.

Plaintiffs focus on the phrase "in each case" in the Releases. The Releases take four entities and break them into two groups. Clause [A] refers to "Assignor [Bundora] and Assignee [third-party purchaser] *on the one hand*" and Clause [B] refers to "the General Partners and the Partnership [collectively, Carlyle's Affiliates] *on the other hand*." The parenthetical then begins "including *in each case* . . ." the other's Related Parties [C]. There are two possible readings of "in each case." The first, Defendants', posits that the phrase "in each case" must be read to refer to the cases of "the General Partners" and "the Partnership." That interpretation is questionable. Plaintiffs' proposed construction instead reads "in each case" to refer to [A] (Bundora and the purchaser) on the one hand and [B] (the Partnership and the General Partners) on the other hand. Plaintiffs contend that their interpretation of "in each case" is more reasonable than Defendants' reading because Plaintiffs' version comports with the two-sided structure used to define the parties to the Releases.

Two facts bolster Plaintiffs' reading. First, the releasing language—"hereby fully release and discharge the other and, in each case, the other's Related Parties"—treats

30

"other" as singular. This is because the four parties—Bundora, the purchaser, Partnership, and General Partners—have been defined into two groups, [A] and [B], with each having one "other"—*i.e.*, Bundora and the purchaser, together, are the "other" for the Partnership and the General Partners, together, and vice versa. Second, the phrase "in each case" appears again later in the Releases. As a general rule of construction, courts "may presume that the same words used in different parts of a writing have the same meaning."[72] Under Plaintiffs' interpretation, "in each case" means the same thing both times it is used: [A] and [B]. By contrast, Defendants' interpretation requires interpreting "in each case" the first time to mean the Partnership and the General Partners and the second time to mean Bundora and the purchaser on the one hand and the Partnership and the General Partners on the other hand. In sum, Plaintiffs argue that the last antecedent rule does not apply, and that the semicolon should be given little or no weight, because the text of the Releases indicates that the parties had a contrary intention.

Plaintiffs' interpretation, however, arguably creates a surplusage problem. If both [A] and [B] include [C], the Related Parties, then it arguably should have been sufficient to "release and discharge the other." Plaintiffs contend that the phrase "and, in each case, the other's Related Parties" is not superfluous because "Related Parties" is a separately defined term, and a release of "the other" only would involve [A] and [B] mutually releasing each other. Thus, according to Plaintiffs, the clause "in each case, the other's

---

[72] *Finest Invs. v. Sec. Trust Co. of Rochester*, 468 N.Y.S.2d 256, 258 (App. Div. 1983), *aff'd*, 462 N.E.2d 897 (N.Y. 1984) (TABLE).

31

Related Parties" is required.  This reading is questionable.  The parenthetical may create a new defined term, but it is unclear why.  The parenthetical begins "(including in each case . . ." which textually appears to be defining "each case" ([A] and [B]) as including the list of entities comprising the Related Parties ([C]) of those entities.  Plaintiffs aver that the "in each case, the other's Related Parties" language *clarifies* that Related Parties in fact are being released—*i.e.*, that clause eliminates a potential ambiguity as to whether Related Parties were both granting releases and being released.  That argument may ultimately prevail, but the language of the Releases is not clear.  Based on the countervailing problems with Defendants' interpretation, however—namely the excessive reliance on the last antecedent rule and the semicolon when the text seemingly points in the opposite direction—I do not find the potential surplusage problem with Plaintiffs' reading so serious as to render their interpretation unreasonable.

Because there are at least two reasonable interpretations—albeit two interpretations that each suffer from various shortcomings—I conclude that the Releases are ambiguous and that dismissal on the basis of Defendants' proffered construction is not appropriate.  Accordingly, at this procedural stage and for purposes of this Memorandum Opinion, I conclude that the Releases conceivably could textually bind Bundora's Related Parties, including both Plaza and Reijtenbagh.

Defendants further argue that even if the plain text of the Releases purports to bind Bundora's Related Parties, Count I should be dismissed because non-parties to the

contract cannot be bound.[73] Most of Defendants' argument on this issue simply misconstrues Plaintiffs' argument. Defendants contend that directors are not liable under a corporation's contract simply because they are directors. But, this is beside the point.

Instead, Plaintiffs' primary argument is that Reijtenbagh and Plaza are bound by the Releases under principles of agency.[74] This argument posits that Bundora released its Related Parties' claims and that Bundora had either actual or apparent authority to do so because those Related Parties (Plaza and Reijtenbagh) read the Transfer Agreements, including the Releases, and signed them (Reijtenbagh signed as a director of Plaza, which was Bundora's sole director). Defendants' argument that Bundora was not acting as a direct agent eventually may be proven true, but it ignores the apparent authority problem. I have concluded that the Releases conceivably could be interpreted as releasing Bundora's Related Parties' claims. That Plaza, as Bundora's director, executed the Transfer Agreement and that Reijtenbagh, as Plaza's director, signed the Transfer Agreements supports an agency theory.[75] Whether Bundora had the authority to release

---

[73]    As noted previously, the Third Circuit Decision preclusively rejected this argument as it applies to the forum selection clauses.

[74]    *See* Pls.' Answering Br. 21-23. Plaintiffs' argument that Reijtenbagh and Plaza "manifested an intent to be bound" under the Releases is similar to this agency issue and depends on disputed facts.

[75]    Defendants argue that the Complaint does not plead an agency theory. I disagree. The Complaint explicitly pleads that "Reijtenbagh caused Bundora to execute" the Transfer Agreements, Compl. ¶ 47, and that "by agreeing to and executing the Transfer Agreements and Releases for valuable consideration, the Reijtenbagh Defendants released any and all claims they had or may have had against

33

Reijtenbagh's and Plaza's claims cannot be resolved on a motion to dismiss because the Complaint pleads facts that make such a finding reasonably conceivable.

For the foregoing reasons, I conclude that the Releases could have released all of Reijtenbagh's and Plaza's claims against Carlyle and that it is reasonably conceivable that Bundora had the authority to execute such a release or that Reijtenbagh and Plaza otherwise were bound by it.

### d. Has a breach of the Releases been pled?

Defendants argue that, even if they are bound by the Releases and had released all of their claims against Carlyle, no breach of the Releases has been pled. Although the briefing focused primarily on the alleged funding of the Guernsey Litigation, the Dutch Tolling Letters and the formation of SRCCC are also at issue.

The Releases broadly released:

> any and all obligations, claims, demands, damages, liabilities, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents and executions whatsoever, of whatever kind or nature, actions, causes of action or suits at law or in equity of whatever kind, state or federal, known or unknown, suspected or unsuspected, whether brought in any federal or state court, or in any court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, which any of the releasing parties ever had or now has, or may have in the future, upon or by reason of any matter, cause or thing occurring on or prior to the Effective Date.

---

Plaintiffs." *Id.* ¶ 50. The standard in Delaware is notice pleading. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

34

Defendants argue that none of the alleged breaches—the Dutch Tolling Letters, the formation of SRCCC, or the alleged funding of the Guernsey Litigation—falls within the ambit of the Releases. At this procedural stage, Plaintiffs only need to plead facts under which it is reasonably conceivable that the Releases have been violated. I conclude that such facts have been pled.

Defendants' main contention is that there is a fundamental distinction between a release and a covenant not to sue. According to Defendants, a release provides only an affirmative defense in a suit.[76] Thus, Defendants maintain that "assertion of a released claim would not give rise to or imply a right to damages."[77] I find this argument unpersuasive. The Releases are contracts; breaching those contracts by asserting a released claim conceivably could give rise to a cause of action for damages, including, for example, attorneys' fees and costs that Plaintiffs otherwise would not have incurred if Defendants had complied with the Releases.

Aside from the funding of the Guernsey Litigation, both SRCCC's formation and the Dutch Tolling Letters conceivably could state a claim for breach of the Releases. This Court is not expert in Dutch law. The Complaint pleads that SRCCC is a special purpose entity created for the sole purpose of pursuing claims on behalf of CCC's stockholders, including Defendants. Similarly, the Dutch Tolling Letters allegedly had

---

[76]   Defendants cite only a Seventh Circuit case for this proposition, *Isbell v. Allstate Ins. Co.*, 418 F.3d 788 (7th Cir. 2005).

[77]   Defs.' Reply Br. 11.

35

the legal effect of tolling (or, at least, attempting to toll) the statute of limitations for Moonmouth's and SRCCC's claims, an action to which Plaintiffs claim they were forced to respond. The import of Defendants' actions under Dutch law is unclear from the present record. As a result, I cannot say with confidence that it is not reasonably conceivable that these actions could constitute a breach of the Releases.[78]

The Guernsey Litigation presents a more complex issue. The Complaint alleges that Reijtenbagh is funding the Liquidators. Defendants argue that, even if true, such financing does not amount to a breach of the Releases because the claims asserted by the Liquidators are fiduciary duty claims that belong to CCC rather than Reijtenbagh.[79] Assuming this is true,[80] dismissal still would not be appropriate. I also assume, without deciding, that there theoretically may be circumstances in which the Releases would not bar Defendants from participating in any eventual recovery that may result from the Guernsey Litigation. Instead, I focus on Reijtenbagh's alleged financial support of the Guernsey Litigation. First, a factual dispute exists as to whether, and to what degree,

---

[78] If, because of the Releases, neither Reijtenbagh nor Plaza had a right to assert any claims relating to CCC, it is reasonably conceivable that it was a breach of the Releases for them to undertake efforts to toll the statute of limitations for such claims to preserve their ability, directly or indirectly, to assert those claims at a later date.

[79] *See Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 776 (Del. Ch. 2004) ("At all times, claims of this kind belong to the corporation itself . . . .").

[80] At this preliminary stage, there is nothing in the record, to the Court's knowledge, that indicates there are material distinctions between Delaware and Guernsey law on this issue.

36

Reijtenbagh is financing the Liquidators. Second, it is unknown whether Reijtenbagh is providing non-monetary support for the Guernsey Litigation.

In any event, based on the allegations in the Complaint, Plaintiffs conceivably could prove that Reijtenbagh provided sufficient financing or other support for the Guernsey Litigation such that the Liquidators could not have proceeded without his assistance. Such factual disputes cannot be resolved on a motion to dismiss. Plaintiffs effectively argue that Reijtenbagh is breaching the Releases by attempting to do indirectly (recover through the Guernsey Litigation, which appears to be proceeding on what would amount to a derivative or class basis under Delaware or New York law) what he could not do directly (sue Carlyle based on his investment in CCC). There is some precedent in Delaware, at least, for Plaintiffs' position.[81] Thus, I cannot say as a matter of law that the alleged funding of the Guernsey Litigation is not a breach of the Releases.

### 4. Counts II and III: Breach of the Forum Selection Clauses

Counts II and III seek a declaratory judgment that the Subscription Agreement FSC is valid, binding, and enforceable and that any claims Defendants may have arising from Reijtenbagh's investment in CCC must be brought in Delaware. Those Counts further request injunctive relief enforcing the Releases and enjoining Defendants from bringing claims relating to CCC anywhere other than Delaware.

---

[81] *Cf. Orloff v. Shulman*, 2005 WL 5750635, at *8 (Del. Ch. Nov. 23, 2005) (holding that *res judicata* prevented stockholders from bringing derivative claims based on the same factual basis as previously dismissed individual claims).

37

### a.    Standard of review

Delaware Courts are authorized, in certain situations, to hear actions for a declaratory judgment,[82] but there must be an "actual controversy" between the parties.  A motion to dismiss for lack of a case or controversy goes to this Court's jurisdiction and is examined under Court of Chancery Rule 12(b)(1).  The Court will not issue hypothetical or advisory opinions.[83]  There are four requirements for pleading the existence of an "actual controversy":

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination.[84]

"In evaluating the justiciability of a declaratory judgment claim, a court must determine whether 'the facts alleged, under all the circumstances, show that there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a

---

[82]    10 *Del. C.* § 6501.

[83]    *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989).

[84]    *XI Specialty Ins. Co. v. WMI Liquid. Trust*, 93 A.3d 1208, 1217 (Del. 2014) (quoting *Stroud*, 552 A.2d at 479-80).

38

declaratory judgment.'"[85] In determining whether a case is ripe, "Courts must make a 'practical judgment.'"[86]

## b. Count III is moot

Count III consists of a vestigial portion of the Complaint. It relates to SRCCC. Plaintiffs essentially have abandoned this portion of the Complaint, presumably based on the fact that SRCCC was dissolved. Neither party addressed Count III in the briefing and both sides seem to have operated under the assumption that Counts I and II comprise the entirety of the case. Therefore, I conclude that Count III is moot and dismiss it without prejudice.

## c. The Court lacks subject matter jurisdiction over Count II

This case raises a question regarding the point in time at which the Court must determine whether an "actual controversy" exists, either: (1) when the Complaint was filed; or (2) when the Court rules on the matter. In many instances, the temporal gap between those events will be short, and the ongoing lawsuit itself could shape a litigant's behavior. Here, because of the stay during the removal proceedings, the gap is significant. Plaintiffs filed the Complaint on October 23, 2012. Defendants moved to dismiss on December 11, 2013. The Third Circuit affirmed the remand of this case to this Court on February 25, 2015. Today is September 10, 2015. Count II asserts that

---

[85] *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006) (ellipses in original) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990)).

[86] *Id.* at *7.

Defendants imminently will violate the Subscription Agreement FSC. The question for resolution is whether that alleged violation is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[87] I conclude that it is not.

Even if I analyzed the situation as of the filing of the Complaint, Plaintiffs' showing is weak. The Complaint contains no allegation that a lawsuit actually was filed by Defendants outside of Delaware. The Complaint instead focuses on the following: (1) SRCCC's formation; and (2) the Dutch Tolling Letters. I disposed of the claim relating to SRCCC in connection with Count III above. This leaves the Dutch Tolling Letters. Although Plaintiffs rely heavily on these letters as evidence of an imminent lawsuit, Plaintiffs themselves pled that the letters were withdrawn.[88] The only other evidence that arguably supports Plaintiffs' lawsuit theory is the Lipman Karas Memo. But, the Complaint pleads that "Reijtenbagh subsequently indicated he did not intend to pursue his claims at that time, and no complaint was ever filed."[89] In two key instances, then, Plaintiffs' own allegations weigh against the existence of an actual controversy. Finally, Plaintiffs suggest that a controversy exists because Defendants would not sign Plaintiffs' proposed stipulation. I accord minimal weight to that argument, however. Defendants have made at least a colorable showing that the requested stipulation was broader than the

---

[87]    *Energy P'rs, Ltd.*, 2006 WL 2947483, at *6.

[88]    Compl. ¶ 67 ("Lemstra van der Korst responded by disclaiming any intent by Defendants to pursue proceedings against Plaintiffs and abruptly withdrew the Moonmouth and SRCCC Letters.").

[89]    *Id.* ¶ 37.

forum selection clauses and that it would have granted Plaintiffs more than they legally were entitled to under either the Subscription Agreement or the Transfer Agreements.

Conducting the analysis as of a later time only solidifies my conclusion that there is no actual controversy. Both Moonmouth and Parbold—the only entities that actually held CCC shares—have been dissolved.[90] The Dutch Tolling Letters have been withdrawn. After Defendants moved to dismiss on December 11, 2013, Plaintiffs had the option of amending the Complaint or opposing the motion.[91] Plaintiffs stood on their Complaint. Since that time, Plaintiffs have not alleged any additional facts that would support a reasonable inference that an imminent threat exists of a violation of the Subscription Agreement FSC.

Because Delaware law counsels that the Court should use its practical judgment in concluding whether a controversy is ripe, I find it appropriate to consider the events, or absence of events, that have occurred since Plaintiffs filed their Complaint. Having done that and for the reasons just explained, I conclude that no actual controversy underlies Count II. Accordingly, this Court lacks subject matter jurisdiction over that Count, and I dismiss it without prejudice.

---

[90] Plaintiffs speculate that these entities may be resurrected under the laws of the British Virgin Islands. But, there is no allegation that they have been, and conjecture is insufficient to show the sort of immediate, actual controversy that is required for this Court to issue a declaratory judgment.

[91] Ct. Ch. R. 15(aaa).

41

### d.      The Third Circuit Decision effectively mooted Count II

The Third Circuit Decision not only supports my conclusion that Count II does not allege an actual controversy, but also moots at least part of Count II. The Complaint seeks the entry of a declaratory judgment that the Subscription Agreement FSC is binding, valid, and enforceable. The injunctive relief requested essentially asks that I restate the Subscription Agreement FSC and order Defendants not to violate it.

The Third Circuit Decision effectively mooted the requested declaratory relief holding that Defendants are bound by the Subscription Agreement FSC and by the CEP III FSCs, as well. Thus, the declaratory judgment portion of the Complaint is moot.

This leaves the request for injunctive relief. "A claim for injunctive relief must be supported by the allegation of facts that 'create a reasonable apprehension of wrongdoing.'"[92] Above, I concluded that Plaintiffs have not alleged sufficient facts to support a finding that a real and immediate actual controversy exists with respect to the Subscription Agreement FSC. That conclusion is reinforced by the Third Circuit Decision. Now, Plaintiffs must convince me not only that Defendants threatened imminently to breach the forum selection clause—a showing Plaintiffs failed to make— but also that Defendants are likely to breach the Subscription Agreement FSC despite the preclusive Third Circuit Decision, holding that they are bound by that clause. No facts have been alleged that would support such a conclusion. Rather, because "[t]his court

---

[92]      *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 536 (Del. Ch. 2005) (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 606 (Del. Ch. 1987)).

42

cannot permit its jurisdiction to be invoked simply on the basis of unsubstantiated fear that a legal duty may be breached in an uncertain future,"[93] I find that there is no reasonable apprehension of wrongdoing here and grant Defendants' motion to dismiss Count II.

## B.      Motion to Strike

Because I have not dismissed the entire Complaint, I also must consider Defendants' motion to strike. Defendants have moved to strike paragraphs 34-44 and 73-82 of the Complaint under Rule 12(f).

## 1.      Standard of review

Pursuant to Rule 12(f), "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[94] Motions to strike focus on the form of the pleading rather than its substance.[95] These motions are disfavored, and are "granted sparingly and only when clearly warranted with all doubt being resolved in the nonmoving party's favor."[96] Stated affirmatively, a motion to strike is granted if the challenged averments are: (1) not relevant to an issue in the case; and (2) unduly prejudicial.[97]

---

[93]    *Id.*

[94]    Ct. Ch. R. 12(f).

[95]    *Salem Church Assocs. v. New Castle Cty.*, 2004 WL 1087341, at *2 (Del. Ch. May 6, 2004).

[96]    *Id.*

[97]    *Id.*

According to Defendants, the paragraphs they seek to have stricken "are offensive and calculated to prejudice the Court against Defendants."[98] Defendants' solution to the risk of such prejudice, apparently, is to demand that the Court sift through briefing on the offending paragraphs and then independently analyze those very paragraphs to see if they qualify as "immaterial, impertinent, or scandalous matter."

### 2. Analysis

Paragraphs 34-44 and 73-82 are at issue. Paragraphs 34-37 allege that Reijtenbagh investigated potential claims against Carlyle and that he previously had funded a Lipman Karas lawsuit against another company. The motion to strike these paragraphs is frivolous. That Reijtenbagh previously funded litigation provides support for the allegations that he currently is funding litigation regarding various Carlyle entities. An inference to that effect is strengthened by his association with the same Australian law firm, Lipman Karas, in both instances. The Lipman Karas Memo also supports Plaintiffs' claim that Defendants were attempting to bring claims outside of Delaware.

For the same reasons, I deny the motion to strike Paragraphs 73-82. Defendants understandably take umbrage at the allegation that Reijtenbagh is funding the Guernsey Litigation because he is "[u]nable or unwilling to pursue claims in his own name given his status as a fugitive from the Belgian tax authorities."[99] That allegation, however, is

---

[98]     Defs.' Opening Br. 28.

[99]     Compl. ¶ 73.

44

not wholly irrelevant. It provides an explanation, when combined with the Releases, as to why Reijtenbagh would pursue his claims secretly. The other allegations in paragraphs 74-82 support the claim that Reijtenbagh is funding the Guernsey Litigation by emphasizing that: (1) Lipman Karas is closely associated with Reijtenbagh; (2) the asserted claims track the Lipman Karas Memo; and (3) the press widely has publicized Reijtenbagh's litigation funding activities in Australia, where Lipman Karas is headquartered.

This leaves paragraphs 38-44. These paragraphs, some of which are quite long, detail Reijtenbagh's financial difficulties in 2009, including, among other financial misfortunes, a sizeable adverse judgment by the Belgian tax authorities and the seizure by creditors of several works of rare art previously pledged as collateral. Although less clear than the other paragraphs, I also find these paragraphs relevant, if only barely so. They explain, in a non-conclusory manner, how Reijtenbagh fell into financial difficulty. Those alleged money troubles provide an explanation for why Reijtenbagh would agree to the expansive Releases that Plaintiffs allege he did.[100] Because doubts are resolved against the movant on a motion to strike, I deny Defendants' motion with respect to these paragraphs, subject to one exception. I grant the motion to strike with respect to footnote 1 referenced in paragraph 44. That footnote adds nothing of substance to the Complaint's

---

[100]   Because I have found the Releases ambiguous, these background facts regarding the negotiation of the Releases may be admissible to resolve the ambiguity. Reijtenbagh's financial hardship coupled with the need to get Carlyle's permission to transfer Bundora's membership interests creates a negotiating dynamic that arguably favors Plaintiffs' interpretation of the Releases.

narrative and borders on scandalous. Because I find footnote 1 immaterial, impertinent, and unduly prejudicial, I order it stricken under Rule 12(f).

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Specifically, Counts II and III are dismissed without prejudice. I deny the motion as to Count I. Additionally, I deny Defendants' motion to strike, except to order that footnote 1 be stricken.

**IT IS SO ORDERED.**